Lucie Hamilton, Respondent, *v.* The Fidelity Mutual Life Association of Philadelphia, Pennsylvania, Appellant.

*Insurance policy — when the fact that an agent incorrectly writes down answers of the assured does not excuse their untruthfulness.*

A policy of life insurance provided that "if any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be, *ipso facto*, null and void;" the application, which was signed by the insured, contained a stipulation by him "that the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract;" "that no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing and be presented to and approved by the officers of the association," and also a statement that the insured did not use and never had used spirits, wines, malt liquors or narcotics, except two or three glasses of beer a day, and had always been temperate and sober.

In an action brought by the beneficiary of the policy to recover thereon, it appeared that this statement was untrue and that the insured was intemperate; but it was claimed that the insured had made true statements on this subject to the agent of the defendant, who had written them down incorrectly.

*Held*, that a refusal of the court to charge that the defendant was not bound by any verbal statement made by the insured to the agent of the defendant which did not appear in the application, was erroneous.

APPEAL by the defendant, The Fidelity Mutual Life Association of Philadelphia, Pennsylvania, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Erie on the 27th day of May, 1897, for $2,213.33, and also from an order entered in said clerk's office on the 5th day of June, 1897, denying the defendant's motion for a new trial made upon the minutes.

This action was brought to recover upon a certificate of membership in the defendant issued by it on the 9th day of January, 1895, in consideration of $11.26 paid that day and premiums to be paid subsequently on the life of James Hamilton, and an agreement to pay $2,000 in the event of his death to his wife, Lucie Hamilton, the plaintiff. The assured died on the 17th day of April, 1895.

The answer of the defendant admits that it " did receive one James Hamilton, of Buffalo, New York, as a member of defendant association on certain terms and conditions, and did issue its certain policy of insurance upon the life of said James Hamilton."

The answer alleges: " Said James Hamilton falsely represented and set forth in his application for insurance, upon which said policy was issued and which was incorporated in and made a part of said policy, that he, said James Hamilton, did not then use and never had used spirits, wines, malt liquors or narcotics, and had always been temperate and sober, except that he used about two or three glasses of beer a day; that as a matter of fact said Hamilton, at the time of executing said application and for a long time prior thereto, had been and was addicted to the use of spirits, wines, malt liquors and narcotics, and used the same or some of them, excessively, and, at the time of making the same, knew the said statements in said application relating thereto were false, and said Hamilton so made said false statements as aforesaid for the purpose of inducing this defendant to issue said policy; that all of the statements so made as aforesaid in said application were material, and, relying upon the same as true, this defendant did issue said policy as aforesaid; that by reason of said false and fraudulent statements so made

by said Hamilton in said application as aforesaid, said policy became prior to and was, at the time of said James Hamilton's death, and now is, null and void."

The policy issued by the defendant contained the following language : " In consideration of the application for this policy, *which is made a part hereof*, and a copy of which is hereto attached, and the payment to said association of eleven and 26-100 dollars upon the ninth day of the month of January, April, July and October in every year for the period of fifteen years. * * * Does hereby receive James Hamilton of Buffalo * * * as a member of said association, and issues this policy of insurance, and hereby promises to pay the sum of two thousand dollars to his wife Lucie Hamilton ; * * * subject, however, to all the requirements hereinafter stated, and the conditions hereon indorsed, which are hereby referred to and made a material part of this contract."

In the conditions indorsed on the policy are the following :

"*Fifth.* No agent of the association has any power or authority to make, alter or discharge contracts, waive forfeitures or grant credit, and no alteration of the terms of this contract shall be valid, and no forfeiture hereunder shall be waived, unless such alteration or waiver be in writing and be signed by the president of the association.

" *Sixth.* If any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be *ipso facto* null and void."

The application, in writing, made by James Hamilton and by him signed, is dated the 20th day of December, 1894, and in the 11th subdivision thereof appears the following :

"*11th.* That I do not use, and never have used, spirits, wines, malt liquors or narcotics, and have always been temperate and sober, except as stated below ; I use about two or three glasses of beer a day."

It also contained the following : " I hereby agree and bind myself as follows : That the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract with the said association ; that I have signed this application in my own proper handwriting ; * * * that no verbal statement, to whomsoever made, shall

modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing and be presented to, and approved by, the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures or grant credit; * * * and that if any concealment or untrue statement or answer be made or contained herein, then the policy of insurance issued hereon and this contract shall be *ipso facto* null and void. "

*Wilber E. Houpt,* for the appellant.

*Moses Shire,* for the respondent.

HARDIN, P. J. :

The defendant was organized under and in pursuance of the laws of Pennsylvania, and is known as a co-operative assessment company, and it had in the year 1895 numerous by-laws.

In the 11th answer made in the application, James Hamilton states that he did not use and never had used spirits, wines, malt liquors or narcotics, except that he used two or three glasses of beer a day; and he, in effect, also stated that he had always been temperate and sober.

Defendant called a large number of witnesses, who testified to the intemperate habits of the insured.

The witness Rochvot, a justice of the peace, had lived in the same house with the deceased for about two years, and he testified that he saw him intoxicated frequently, and that he had seen him drink a great many times, and that he always took whiskey.

The witness Lines gave testimony to the effect that he was a saloon keeper, and that Hamilton had frequently been in his saloon and drank whiskey, and that the witness had seen him intoxicated on several different occasions, so much so that the witness refused to sell him more drinks, and that Hamilton frequently bought whiskey at his place and took it away in a bottle.

The witness Francis testified that he had seen Hamilton under the influence of liquor and intoxicated quite frequently, and that he had seen him stagger from intoxication, and had known of his leaving jobs after being more or less intoxicated; that he had seen him drink whiskey, while at work, out of a bottle or flask.

The witness Hartell testified to having seen Hamilton drink and

to his asking him to come to his room and drink with him, and that he had seen Hamilton under the influence of liquor a great many times.

The witness Precor testified that he had known the deceased a couple of years, and that he had seen him in Murphy's saloon on the morning that he was hurt, standing at the bar, and that he had seen Hamilton intoxicated two or three times near his house on the street.

The witness Van Everding testified that he had seen Hamilton at Murphy's saloon when he was intoxicated, and that he always drank whiskey.

Gerard Van Everding, son of the last witness, testified that he had known Hamilton four or five years before he died, and that he saw him the Sunday that he was injured in Murphy's saloon, and that he was intoxicated; that just prior to his injury Hamilton started to go down stairs and the witness took him by the arm and told him it was not safe to go down first, and that the deceased insisted upon going down first, and that he then fell down stairs and received the injuries from which he, three days after, died.

The witness Plembel testified that he had seen Hamilton at his saloon at different times for several years, and had seen him drink and become intoxicated a number of times, and that in the morning he used to drink whiskey; that he was in the habit of visiting that saloon for a couple of years daily, and that the witness had refused him drinks when he came there pretty "full" on as many as a dozen occasions.

Dr. Crawford testified that he made an examination of the deceased and he found that his condition, at the time of the injury, was such that it was impossible to tell whether he was suffering most from alcohol or concussion of the brain, and that he was sure he had been drinking.

The witness Drake was a laborer and had worked with the deceased for several years, and he testified that he had seen him drink as many as a dozen times, and that he had seen the deceased have a bottle of whiskey with him and seen him drink out of it, and had seen him when he was "pretty full," "about half tight when at his work, and sometimes he would go away from his work when he got so tight he wasn't able to work."

Murphy testified that he kept a saloon at No. 288 South Division

street in the month of April, 1895, and that Hamilton was hurt at his place by falling down stairs ; that he came to the witness' saloon about six o'clock in the morning and took a drink of whiskey, and the witness adds that it is his recollection that the deceased came pretty nearly every morning to get a drink of whiskey.

The witness Grodzinski testified that he had lived next door to Hamilton in the years 1889 and 1890, and that he had seen him intoxicated fifty times.

The witness Cosgrif testified that he had known Hamilton for twenty years and had seen him under the influence of liquor while he was at work at different times, and that he had frequently seen him "pretty full," and that he had met him on the street when he was intoxicated.

Chrisdall, a dock-wolloper, was acquainted with Hamilton about two years, and was with him on the day he received the injury from which he died.   He testifies that he saw Hamilton drunk once about six or seven months before he was killed.

After this evidence was given, the plaintiff called several witnesses who testified to numerous occasions when they had seen the deceased when he was not intoxicated.   Several of them, however, admitted that Hamilton drank whiskey.

The preponderance of the evidence is to the effect that Hamilton was not a temperate and sober man, but that he was addicted to the use of intoxicating drinks, to an extent greatly beyond that specified in his answer to the 11th interrogatory in the application signed by him.

In the course of the charge delivered by the learned trial judge, after referring to the answer to the 11th interrogatory, he said : "It is now practically conceded that this is not a truthful statement of the habits of the deceased.   In addition to using beer he did use whiskey, and, if he desired it, other sorts of liquor.   But it is the claim of the plaintiff that the answers made by Mr. Hamilton to the agent were truthful in every respect, and that they were not put down by the agent as they were given, and consequently it is the claim of the plaintiff that he is not responsible for the answers which are contained in this application, and it does not work a forfeiture.   Now, in denying the defendant's motion for a nonsuit, also for a direction of a verdict, the court substantially held, that if Hamilton made truthful representations to Smith, Smith being the

agent of the defendant company alone, and he put down false answers for any reason, that then they would not avoid the policy of Hamilton, provided that he had no knowledge of it. And that, I charge you, is the law." And further on in his charge he said: "Now, as I have said, if that is true, and he was truthful in his statements to the agent and the agent has been guilty of misrepresentations, the plaintiff could recover notwithstanding." And the learned trial judge submitted to the jury the question of whether Hamilton, "at the time he made his application, was a temperate and sober man within the meaning of these terms. * * * If he was not a temperate and sober man, as you understand it, then the plaintiff cannot recover; if he was a temperate and sober man, as is claimed by the plaintiff's counsel, then he can recover."

In response to a request made by the defendant's counsel, the trial judge charged: "That the undisputed evidence in this case establishes the fact that James Hamilton did, prior to, at the time of and subsequent to the time of making said application, use other spirits and malt liquors than that of beer." He also charged, viz.: "That under the evidence the statements contained in paragraph 2 of the application, as it was forwarded to the company and attached to the policy, were false and untrue." And he also charged that all the statements contained in said application were material to the risk. He refused to charge "that the defendant is not bound by any verbal statement made by James Hamilton to Matthew Smith which does not appear in the application." To that refusal an exception was taken. He also refused to charge "that no verbal statement, made by either Hamilton or the plaintiff prior to or at the time of making the application, can modify the application and policy as it now stands unless such statement was reduced to writing and presented to and approved of by the officers of the defendant." To the refusal to charge the defendant took an exception.

The learned counsel for the respondent concedes that the evidence shows that the deceased "was accustomed to use other liquors besides beer, namely, wine and whiskey." He then contends that the application for the policy was made out by Smith, the company's agent, and that he wrote into the application the answers; and it is urged that the testimony is to the effect that the deceased, when asked as to his drinking, truthfully answered the questions and told

of his drinking beer, wine or whiskey, as he saw fit, and that that fact is established by the testimony of the witness Smith and by the plaintiff, and that Smith supposed he had given a sufficient answer to the question. And it is contended by the respondent that, as the answer was taken down by Smith, the agent of the company, although it was untruthful, the defendant cannot take advantage of the imperfect and false answers inserted in the application; and he calls our attention to *O'Brien* v. *Home Benefit Society* (117 N. Y. 310); *Peters* v. *U. S. Industrial Life Ins. Co.* (10 App. Div. 533); *Singleton* v. *Prudential Ins. Co.* (11 id. 403), and *Kenyon* v. *K. T. & M. M. A. Assn.* (122 N. Y. 247). In the last case cited it was said : " The cases in which knowledge of the agent, through whom insurance is taken, may operate to defeat the right of the company to avail itself of the fact so known, at the time it is taken, are those in which there is no application signed by the assured stating to the contrary of such existing fact, but rests upon a condition expressed in the policy merely, in which case it may be presumed that the statement of the fact in the policy, as required by the condition, was omitted by mistake or waived. Such is not the rule when the alleged breach of warranty is founded upon a misstatement by the assured in his application."

The witness Smith, who took the application, testified, viz. : " The answers were read over just as I made them, I read the questions in the application over, then read the answers. * * * Q. And then you said, ' Well, I will put it down ' I use about two or three glasses of beer per day ' ? ' A. Yes, sir. Q. And you wrote it down and read it over to him ? A. Yes, sir. * * * Q. Didn't you swear in your affidavit, used in this motion for a new trial, that he had it before him and was apparently reading it for some time ? A. That is what I supposed he was. Q. Isn't that the fact ? A. That is right."

In the course of the witness' redirect examination he, to some extent, contradicted his testimony on the subject of having read over the statements, and on his recross-examination the witness repeated : " I did read them to him then (referring to the answers). Q. You did read them to him then ? A. Yes, sir." Hamilton signed the application in the presence of the witness Smith. It must be borne in mind that the application contains an agreement

on the part of the insured as to the truthfulness of the statements made. The application contains the following language, viz.: "I hereby agree and bind myself as follows: That the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract with the said association; that I have signed this application in my own proper handwriting. * * * That no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures or grant credit; * * * and that if any concealment, or untrue statement or answer be made or contained herein, then the policy of insurance issued hereon and this contract shall be *ipso facto* null and void."

Among the conditions annexed to the policy was the following: "*Sixth.* If any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be *ipso facto* null and void."

The policy declares that all the conditions annexed to it are referred to "and made a material part of the contract."

In *Allen* v. *G. A. Ins. Co.* (123 N. Y. 6) it was held that "A policy of insurance forms no exception to the general rule that contracts will be enforced according to their terms, and effect will be given to the expressed and evident intention of the parties." In that case the policy contained provisions that the company would not be bound by any act of, or statement made to, or by any agent or other person which were not contained in the policy; and it is said in the course of the opinion (p. 15): "To these conditions the plaintiff's assent is presumed to have been given by his acceptance of the policy, and there is no reason why he should not be bound by them. If Noble had been the agent of the defendant, it was perfectly competent to stipulate by this contract of insurance that anything done by, or known to, the agent, should be without effect upon the contract, unless made known in writing to the principal."

In *New York Life Insurance Company* v. *Fletcher* (117 U. S. 519) it appeared that the agent, without the knowledge of the appli-

cant, wrote down in his application false answers, concealing the truth, which was signed by the applicant without reading it, and by the agent transmitted to the company, and that the company thereupon assumed the risk. It was conditioned in the policy that the answers were part of it, and that no statement to the agent not thus transmitted should be binding upon his principal; and a copy of the answer, with these conditions conspicuously printed upon it, accompanied the policy, and the court held that the policy was void; and it was held that it was the duty of the party who was an applicant for insurance, before subscribing the same, to read the answers, " and it will be presumed that he did read them."

In *Kabok* v. *The Phœnix M. L. Ins. Co.* (21 N. Y. St. Repr. 203) the application contained a clause declaring that the application should form the basis and be a part of the contract of insurance, and that all answers and statements contained in the application should be taken to be strict warranties ; and it was held that any untruthful statements rendered the policy inoperative. In that case there was a clause in the application declaring that the agent, in the preparation of the application, acted as the agent of the assured, and not of the company, and it was held that the untruthful statement inserted by the agent, either by mistake or otherwise, avoided the policy.

In *Bernard* v. *United Life Ins. Assn.* (14 App. Div. 142) it was held, viz. : " An insurance company may protect itself against the effect of fraudulent acts upon the part of its agent by covenants in the policy to the effect that the agent, in transcribing the statements and answers of the applicant to questions contained in the application, shall be deemed to be solely the agent of the applicant, and where such provisions, in protection of the insurer, exist, the rule that the insurance companies are bound by the knowledge of their agents, acquired by statements made to them, and that these statements may be proved by parol, has no application."

In *Maier* v. *Fidelity Mutual Life Association* (78 Fed. Rep. 566) an application and policy very similar to the ones that are brought before us in this case were under consideration, and it appeared in that case that Rothschild, the soliciting agent, suppressed material facts, and by reason of such suppression obtained a policy, and it was insisted that, because of the falsity of the statements being attributed to the agent, there could be a recovery, and that the

company was estopped to deny the validity of the policy on the ground that the agent knew the facts and suppressed them when preparing the answers, or failed, fraudulently or negligently, to bring out the facts called for by the questions in the application. Harlan, Ch. J., who delivered the opinion, said: "We cannot accept this view of the contract between the parties. If the assured authorized the soliciting agent to prepare his answers to the questions propounded, and thereafter signed the application so prepared, neither he nor any one claiming the benefit of the policy ought to be heard to say that he did not read the answers, or know their contents before signing the application. His attestation of the application by his signature was a representation to the company that the answers were true; for, by the terms of his application, he stipulated that the statements made in answer to questions, ' by whomsoever written,' were material to the risk, and warranted to be true, and if any conceal- ments or untrue statements or anwers were made, the policy, as well as the contract evidenced by it, should be *ipso facto* null and void; and when the accused* accepted a policy declaring upon its face that it was issued in consideration of the application made part of the policy, and subject to the conditions indorsed on the policy, the contract became complete, and its terms are to be respected, and cannot, in an action on the policy, be ignored or made of no effect. It is an essential fact in the case that, in the body of the contract evi- denced by the policy, are found recitals which make the applica- tion, as well as the conditions indorsed on the policy, part of the contract of insurance." And later on in the course of the opinion it was said: "As the assured stipulated that his statements, which were the foundation of the application, were true, by whomsoever such statements were written, and as the contract of insurance was consummated on that basis, the court cannot, in an action upon the contract, disregard the express agreement between the parties, and hold the company liable, if the statements of the assured — at least those touching matters material to the risk — are found to be untrue."

A similar doctrine was laid down in *Wilkens* v. *The Mutual Reserve Fund Life Association* (54 Hun, 294). In that case it was pro- posed to prove that the assured, at the time he made the application for the insurance, informed the agent of the defendant as to the

---

*Assured.—[Rep.

facts being otherwise than as stated in the application, and it was held that, as the assured, by the application, "took upon himself the entire risk of the truth of the representations made by him, and on the correctness of which the certificate was made to depend," the proof was properly rejected. It was further said that, "where the assured in this manner accepts and binds himself for the truth of the statements contained in the application, that he cannot be relieved from that result by proof of the fact afterwards made that the agent improperly, as well as untruthfully, filled out the application."

We think the doctrine laid down in the cases to which we have just adverted apply to the case in hand. The assured expressly stipulated that "no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures or grant credit." The application also contained the further stipulation : "If any concealment or untrue statement or answer be made or *contained herein,* then the policy of insurance issued hereon and this contract shall be *ipso facto* null and void."

The evidence clearly indicates that there was a concealment of material facts, and that there were untrue statements or answers made or contained in the application, and, therefore, the plaintiff ought not to be permitted to recover upon the contract of insurance issued in consideration of the application, which, by the terms of the policy, "is made a part of" the policy. And we think that the exception taken to the refusal of the court to charge "that the defendant is not bound by any verbal statement made by James Hamilton to Matthew Smith, which does not appear in the application," presents an error.

The foregoing views lead to the conclusion that the verdict ought to be set aside.

All concurred in the result on the ground that the verdict is contrary to the evidence.

Judgment and order reversed and a new trial ordered, with costs to the appellant to abide the event.